# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| MOZETTE CHINN, | : | Case No. 3:18-cv-101 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## DECISION AND ENTRY

## I.    Introduction

Plaintiff Mozette Chinn brings this case challenging the Social Security

Administration's denial of her application for Supplemental Security Income.  She

applied for benefits on October 21, 2013, asserting that she could no longer work a

substantial paid job.  Administrative Law Judge (ALJ) Elizabeth A. Motta concluded that

she was not eligible for benefits because she is not under a "disability" as defined in the

Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the

Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11),

and the administrative record (Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Motta's non-disability decision.

## II.    Background

Plaintiff asserts that she has been under a "disability" since March 1, 1983. When she filed her application, she was forty-seven years old at that time and was therefore considered a person "closely approaching advanced age" under Social Security Regulations. *See* 20 C.F.R. § 416.963(d). She has a high school education. *See id.* § 416.964(b)(4).

### A.    Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Motta that she is in pain and her legs "like[] to collapse." (Doc. #6, *PageID* #77). They have been collapsing for five or six years. *Id.* at 78. She started using a cane because her balance worsened after she had a heart attack in August 2013. *Id.* Despite using a cane, she has fallen a few times; she "tip[s] over." *Id.* at 89. Her doctor did not prescribe the cane but told her she could use one if she needed it. *Id.* at 78.

Plaintiff has pain from fibromyalgia. *Id.* at 78. When she is having a bad day, her pain is so severe that she cannot even hug her grandchildren. *Id.* at 91. She does not have any specific medication for it because she was only re-diagnosed with it the week before the hearing and her family doctor referred her to a pain specialist rather than prescribing it. *Id.* at 78. Her doctor did, however, prescribe pain medication for

Plaintiff's "general pain" until they could find out what was wrong with her legs and spine. *Id.* at 79.

Plaintiff has pain from the back of her right ankle to the top of her toes. *Id.* at 85. She "badly sprained that … main tendon." *Id.* At the time of the hearing, Plaintiff had worn an air cast on her right foot for a week. *Id.* She had a follow-up appointment in three weeks. *Id.*

Plaintiff has had trouble with her stomach since she was born. *Id.* at 79. She has acid reflux and gets inflammation when she eats. *Id.* at 80. She gets nauseated, vomits, and has severe pain. *Id.* at 90. She has to go to the bathroom a lot. *Id.* She takes stomach medication. *Id.* at 79. Additionally, Plaintiff has high blood pressure that causes her to feel dizzy and she gets "very, very hot and sweaty." *Id.* at 89.

Plaintiff has struggled with mental health since she was a child. *Id.* at 81. She "can't be around people." *Id.* Dr. Chan prescribed psychiatric medication. *Id.* at 80. At the time of the hearing, Plaintiff had only seen Dr. Chan once. *Id.* She had seen a therapist for about two months. *Id.* Before Plaintiff began treatment with Dr. Chan, Dr. Teegala prescribed her psychiatric medication. *Id.* Plaintiff has panic attacks. A "minor one" lasts between one hour and a few hours. *Id.* at 88. Other ones last for a few days. *Id.* During a good week, she has panic attacks five out of seven days. *Id.* During a bad week, she has them every day. *Id.* Being outside or being around people causes her panic attacks. *Id.* at 88-89. Plaintiff does not like to have people behind her. *Id.* at 91. She will not go anywhere if she is not able to be in a corner where no one can walk behind her. *Id.*

3

Plaintiff lives in an apartment with her daughter, two grandsons, and her daughter's boyfriend. *Id.* at 76. She let her driver's license expire in 1995 because she almost hit a small child. *Id.* at 76-77. Her daughter drives her around. *Id.* at 83. Plaintiff has trouble bending over, pulling, and lifting. *Id.* at 89. She can only lift about a carton of eggs. *Id.* She cannot lift a gallon of milk. *Id.* Plaintiff can sometimes prepare meals but other times, she has trouble standing. *Id.* at 83. On a good day, she can stand for ten to fifteen minutes. *Id.* at 91. On a bad day, she can only stand for a minute or two. Usually, her grandson or daughter washes dishes. *Id.* at 84. She can do laundry as long as she is sitting down and someone gets the laundry in and out of the machines for her. *Id.* at 83. She does not vacuum, sweep, or mop. *Id.* at 84. She can dress herself except for her bra and air cast boot. *Id.* at 85. Plaintiff does not use a computer and does not use the internet on her phone. *Id.* at 86. During the day, she reads. *Id.* at 87. She likes to read thrillers, horror, and historical romance. *Id.* at 86. But she has a hard time remembering what is going on in the book if she does not read it all in one day. *Id.* at 90. She also sometimes has trouble holding onto the book. *Id.* She does crafts such as painting ceramics and drawing "when [her] hands allow it." *Id.* at 87. During good weeks, she can do crafts three or four days a week. *Id.* During bad weeks, she is lucky if she is able to do crafts one day. *Id.* On a bad week, she cannot hold onto anything. *Id.* at 87. She also listens to music, watches movies, and loves on her cat, Denarius. *Id.* If she is having a "very good day," she visits her neighbor. *Id.* at 84. She goes grocery shopping late at night. *Id.* She never leaves her house without someone else with her. *Id.* at 88.

### B. Medical Opinions

#### i. *George O. Schulz, Ph.D.*

Dr. Schulz examined Plaintiff in March 2013. *Id.* at 307. Plaintiff reported that she has struggled with anxiety and panic attacks since she was a child. *Id.* at 310, 312. She started seeing a counselor when she was seven years old until she was twelve years old. *Id.* at 311. But Plaintiff does not think counseling improved her anxiety. *Id.* at 311.

Dr. Schulz diagnosed panic disorder with agoraphobia. *Id.* at 314. He opined that in a work setting, Plaintiff "is expected to be able to understand and apply instructions …" consistent with average intellectual functioning." *Id.* at 314. She is "mentally capable of completing routine or repetitive ADL tasks both at home and in the community or on a job setting." *Id.* at 315. He explained that although she "may experience a subjective sense of reduced effectiveness" in her ability to maintain attention and concentration and maintain persistence and pace, "objective changes at a level prompting concerns by employers are not to be expected." *Id.* Plaintiff is able to respond appropriately to coworkers and supervisors in a work setting but is likely to have some difficulty responding appropriately to work pressure. *Id.*

#### ii. *Alan R. Boerger, Ph.D.*

Dr. Boerger examined Plaintiff in March 2014 and April 2015. In March 2014, he noted that Plaintiff's affect was tense and anxious. *Id.* at 398. She surveyed the office when she entered; would not be seen without her husband being present, appeared mildly irritable, and "gave a great sign of relief when told the interview was ended." *Id.* Dr. Boerger diagnosed panic disorder with agoraphobia and post-traumatic stress disorder.

*Id.* at 399. He opined that Plaintiff appeared capable of understanding basic instructions but may have some difficulty retaining instructions under stress because she is preoccupied with anxiety in the presence of others. *Id.* at 400. Plaintiff's anxiety is likely to affect her ability to focus and concentrate because of her hypervigilance and sensitivity to threat. *Id.* Further, her sensitivity to threat and criticism are likely to cause her problems in handling work pressures. *Id.*

At Dr. Boerger's second examination in April 2015, Plaintiff appeared tense, sat with her arms folded, scanned the environment, and asked for her daughter to come into the interview with her. *Id.* at 479-80. He affirmed his previous assessment. *Id.* at 481-82.

    iii.   *Leslie Rudy, Ph.D., & Vicki Warren, Ph.D.*

Dr. Rudy reviewed Plaintiff records in March 2014 and found Plaintiff has seven severe impairments—essential hypertension; osteoarthritis and allied disorders; disorders of her back–discogenic and degenerative; fibromyalgia; ischemic heart disease; inflammatory arthritis; and anxiety disorders. *Id.* at 118. She opined that Plaintiff has a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. *Id.* Plaintiff retains the capacity for simple-to-complex mental activity and would do best in an isolated setting with no production-line pace. *Id.* at 122-23.

In April 2015, Dr. Warren reviewed Plaintiff's record and affirmed Dr. Rudy's assessment. *Id.* at 139-45.

>    iv.    *William Bolz, M.D., & Dimitri Teague, M.D.*

In March 2014, Dr. Bolz reviewed Plaintiff's records. He opined that Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently. She could stand and/or walk for a total of six hours in an eight-hour day and sit for six hours. *Id.* at 120. Dr. Bolz indicated that she could occasionally climb ladders, ropes, and scaffolds and frequently climb ramps/stairs. *Id.* at 121. He noted that Dr. Smith's examination findings were "essentially normal despite subjective complaints of fatigue with extended exertion, which could be attributed to deconditioning." *Id.* at 121.

Dr. Teague reviewed Plaintiff's record in February 2015 and found that Plaintiff was only able to lift and/or carry twenty pounds occasionally and ten pounds frequently. *Id.* at 142-43. He otherwise affirmed Dr. Bolz's assessment. *Id.* at 128-47.

## III.   Standard of Review

The Social Security Administration provides Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ

are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. The ALJ's Decision

As noted previously, it fell to ALJ Motta to evaluate the evidence connected to Plaintiff's application for benefits. She did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 416.920. She reached the following main conclusions:

Step 1: Plaintiff has not engaged in substantial gainful employment since October 21, 2013.

Step 2: She has the severe impairments of coronary artery disease, obesity, anxiety disorder, and beginning on or about August 2016, supraspinatus tendonitis with mild arthritis.

Step 3: She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … subject to the following limitations: (1) lifting and carrying 20 pounds occasionally and 10 pounds frequently; (2) sitting, standing, and walking six hours each during an 8-hour workday; (3) occasional postural activities, such as, balancing, stooping, kneeling, crouching, crawling, and climbing stairs and/or ramps; (4) no climbing ladders, ropes, or scaffolds; (5) no exposure to hazards, such as dangerous machinery, driving as part of job duties, or unprotected heights; (6) no complex or detailed instructions and only simple, repetitive tasks; (7) limited to low stress work, defined as work without strict production quotas or fast pace any only routine with few changes in the work setting; (8) no contact with the public as part of job duties and only occasional contact with coworkers and supervisors, including no teamwork or over-the-shoulder supervision; and as of August 2016, overhead reaching on the right limited to frequently (as opposed to constantly)."

Step 4: She has no past relevant work.

Step 5: She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 41-64). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 64.

## V.    Discussion

### A.    Medical Opinions

Plaintiff contends that the ALJ failed to properly weigh the examining psychologists' opinions and record-reviewing consultants' opinions.

The Regulations require an ALJ to consider and evaluate every medical opinion in the record. *See* 20 C.F.R. §§ 416.927(b), (c). Unless the ALJ assigns controlling weight to a treating source's opinion, the ALJ must consider all of the following factors in deciding the weight to give any medical opinion: examining relationship; treatment relationship; supportability; consistency; specialization; and other factors. *Id.* at (c).

*Dr. Boerger*

ALJ Motta assigned "some weight" to Dr. Boerger's opinions "because they are generally consistent with the findings." (Doc. #6, *PageID* #62) (internal citations omitted). She specified, "his assessments are entitled to some weight to the extent that his opinion is consistent with the findings of some functional limitations due to her mental impairments. However, those opinions are entitled to little weight to the extent they may purport to establish a condition of disability, or greater functional limitations than described above." *Id.* The ALJ discounted his opinions because Plaintiff's presentation—including marked anxiety and social distress—at the evaluations was "vastly different than her presentation noted by the bulk of the record." *Id.* She

emphasized that Plaintiff generally denied significant psychological difficulties to her treating doctors and "[m]ini-mental status examination, with few and sporadic exceptions, note normal mood, affect, and orientation." *Id.* Substantial evidence does not support the ALJ's conclusions.

Although the ALJ questioned Plaintiff's presentation, Dr. Boerger did not. He noted at both evaluations that Plaintiff "was consistent in presenting her history and symptoms." *Id.* at 399, 481. Further, the record shows that Plaintiff regularly reported anxiety to her physicians. For example, in September 2013, Nicole Samuel, MD, noted that Plaintiff reported "daily panic attacks that are often worse when she leaves the house to go to the store." *Id.* at 380. She prescribed medication for Plaintiff. *Id.* at 383.

In addition, Yamini V. Teegala, MD, Plaintiff's primary care physician, indicated in September 2015 that Plaintiff "suffers from anxiety and reports a terrible anxiety attack this morning …." *Id.* at 940. Dr. Teegala "[d]iscussed the mental, physical and sexual abuse she experienced as a child from her father, as well as a boyfriend when she was 14 years old as triggers for her anxiety attacks." *Id.* She referred Plaintiff to a counselor so that she could work through her anxiety and PTSD. *Id.* at 944-45. In December 2015, Dr. Teegala noted that Plaintiff was in the office for a recheck on her anxiety attack. *Id.* at 933. Plaintiff reported that she still feels a little panic. *Id.* And, Plaintiff's gastroenterologist noted in July and October 2015 that Plaintiff had anxiety. *Id.* at 628, 636.

The ALJ failed to recognize that Dr. Boerger's opinion that Plaintiff's "sensitivity to [threat] and criticism are likely to cause her problems in handling work pressures" is consistent with Dr. Schulz's opinion that Plaintiff "is likely to have some difficulty responding appropriately to work pressure." *Id.* at 315. Indeed, the although the ALJ summarized Dr. Schulz's opinion, she failed to weigh Dr. Schulz's opinion at all.

### *Dr. Warren & Dr. Rudy*

The ALJ assigned "some, but not great, weight" to the assessments of the State agency psychological consultants, Dr. Warren and Dr. Rudy. She specifically discounted their opinion that Plaintiff "would do best in an isolated setting with no production line pace." *Id.* at 61. The ALJ found that their opined limitations "appear to be based almost exclusively on the claimant's subjective allegations of agoraphobia." *Id.*

Substantial evidence does not support the ALJ's assumption. The record-reviewing psychologists explained the reasons behind their opined limitations. Dr. Rudy and Dr. Warren indicate that Plaintiff has sustained concentration and persistence limitations "[d]ue to panic disorder and PTSD." *Id.* at 122, 143-44. She has social interaction limitations because she is "[i]rritable and socially avoidant." *Id.* at 122-23, 143-44. Finally, her adaptation abilities are "[r]educed due to anxiety." *Id.* at 123, 144.

Further, the record-reviewing psychologists found that Plaintiff's statements were only partially credible. This suggests that they did not rely solely on her "subjective allegations of agoraphobia." Instead, they relied on the medical evidence they reviewed. Dr. Warren, for instance, noted, "[Medical evidence of record] does indicate high levels of anxiety …." *Id.* at 141. The psychologists also relied on the examining psychologists'

evaluations. They gave great weight to Dr. Boerger's opinions and Dr. Schulz's opinions.

The ALJ questioned their reliance on Plaintiff's complaints of agoraphobia, noting that Plaintiff goes to the library, grocery store, other stores, her daughter's house (when they lived separately), and doctor appointments without difficulty. However, this isn't necessarily a complete picture of the record. For instance, Plaintiff testified that if she goes to the library, she goes to one in New Carlisle, where there are less people. *Id.* at 92. And she can go months without going. *Id.* She goes to the grocery store late at night. *Id.* at 84. She never leaves the house by herself—she always has someone with her. *Id.* at 88.

The ALJ likewise pointed out that "[Plaintiff] did not seek any formal treatment for her allegedly disabling anxiety until June of 2016 when she reported needing a psychiatrist for her SSDI." *Id.* at 62. Primary-care doctors provide "formal treatment" for psychological disorders. And, in this case, Plaintiff's primary-care physician treated Plaintiff's mental impairments long before June 2016. And, the ALJ previously acknowledged that her primary-care physicians prescribed her medication for her anxiety and PTSD. *Id.* at 58. The record confirms this, as explained in more detail above.

Further, "a claimant's failure to seek formal mental health treatment is 'hardly probative' of whether the claimant suffers from a mental impairment, *Burton v. Apfel,* 208 F.3d 212 (6th Cir. 2000) (table), and ''should not be a determinative factor in a credibility assessment'' relating to the existence of a mental impairment." *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 493 (6th Cir. 2011) (quoting *Strong v. Soc.*

13

*Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) (quoting *Blankenship v. Bowen,* 874

F.2d 1116, 1124 (6th Cir. 1989) ("[I]t is a questionable practice to chastise one with a

mental impairment for the exercise of poor judgment in seeking rehabilitation"))).

Finally, the ALJ emphasized notes from Dorothy McNeil at Mental Health

Services for Clark and Madison County, who evaluated Plaintiff in June 2016.

Specifically, the ALJ found, "the evaluation from that source noted that her presentation

was consistent with some confabulation of symptoms and that her allegations of

agoraphobia were incongruent." (Doc. #6, *PageID* #62) (internal citation omitted). Ms.

McNeil noted, "she reports dx of agoraphobia, even though there appears to be some

incongruence." *Id.* at 975. Further, Ms. McNeil noted under the title of

"Presence/Absence/Effectiveness of Coping Skills, Motivation:" "[*rule out*] engagement

of symptom confabulation." *Id.* (emphasis added). Notably, this is not a diagnosis or

even a conclusion; it is a possibility. After the initial evaluation, Ms. McNeil transferred

Plaintiff to Mark Schweikert, LPC, for counseling. He referred her for further psychiatric

evaluation due to the severity of her anxiety. *Id.* at 1125. Additionally, he noted in July

2016, "We[] completed inventory which was in extreme range for anxiety." *Id.* at 1121.

In sum, substantial evidence does not support the ALJ's reasons for rejecting Dr.

Dr. Rudy and Dr. Warren's opinion that Plaintiff would do best in an isolated setting with

no production-line pace.

### Dr. Bolz & Dr.Teague

Plaintiff contends that the ALJ erred in assigning "great weight" to Dr. Bolz's and

Dr. Teague's "patently ill-formed and non-credible" opinions. (Doc. #7, *PageID* #1133).

Plaintiff asserts that the ALJ did not meaningfully analyze these opinions before

assigning them great weight. *Id.* at 1134. Moreover, their opinions do not support the

ALJ's residual functional capacity assessment. *Id.*

Although ALJ Motta assigned "great weight" to the assessments of the State

Agency medical consultants, Dr. Bolz and Dr. Teague, she discounted most of their

opinions. For instance, the ALJ rejected Dr. Bolz and Dr. Teague's "characterization of

[Plaintiff's] impairments, as osteoarthritis, fibromyalgia, and rheumatoid arthritis"

because they "are not supported by objective or clinical findings." (Doc. #6, *PageID*

#61). Indeed, earlier in her decision, the ALJ found that "[t]here is no documentary

evidence supporting diagnoses of fibromyalgia or rheumatoid arthritis." *Id.* at 60.

The ALJ also disagreed with Dr. Bolz and Dr. Teague's postural and

environmental restrictions. She added restrictions to account for Plaintiff's obesity and

subjective complaints. For example, the ALJ limited Plaintiff to occasional postural

activities such as balancing, stooping, kneeling, crouching, crawling, and climbing ramps

and stairs. Further, Plaintiff could never climb ladders, ropes, and scaffolds. In

comparison, Dr. Bolz and Dr. Teague found Plaintiff could frequently climb ramps and

stairs and occasionally climb ladders, ropes, and scaffolds. She had no limitations

balancing, stooping, kneeling, crouching, crawling.

The ALJ only gave one reason for assigning their opinions "great weight." She

found, "the claimant's coronary artery disease and the limitations to the general

requirements of light work activity as descried [sic] above." *Id.* at 61. This is confusing

for two reasons. First, the sentence itself is incomplete. One can only presume she

meant to adopt or agree with those findings.  Second, Dr. McKee and Dr. Bolz opined she

was capable of medium work activity—specifically, she could lift and/or carry *fifty*

pounds occasionally and *twenty-five* pounds frequently.  *Id.* at 120.  It was only upon

reconsideration that Dr. Teague found Plaintiff could only lift and/or carry twenty pounds

occasionally and ten pounds frequently.  *Id.* at 141-42.

Given that she disagreed with most of Dr. Bolz and Dr. Teague's opinions, it is

difficult to determine why she found they were entitled to "great weight."  Although

ALJs are not generally required to discuss all the factors identified in the regulations for

weighing a record-reviewing medical source's opinions, ALJ Motta failed to provide any

meaningful explanation grounded in the regulatory factors for the weight she placed on

these physicians' opinions.  *See* 20 C.F.R. § 416.927(b)-(c).  Therefore, substantial

evidence fails to support the ALJ's according these opinions "great weight."

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[1]

## B.     Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial

evidence or when the ALJ failed to follow the Administration's own regulations and that

shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial

right.  *Bowen*, 478 F.3d at 746.  Remand may be warranted when the ALJ failed to

provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*,

378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's

---

[1] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of
Plaintiff's other challenges to the ALJ's decision is unwarranted.

opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the

plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific

reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see*

*Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm,

modify, or reverse the Commissioner's decision "with or without remanding the cause for

rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand

under sentence four may result in the need for further proceedings or an immediate award

of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th

Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or

where the evidence of disability is strong while contrary evidence is lacking. *Faucher v.*

*Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the

evidence of disability is not overwhelming and the evidence of disability is not strong

while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding

this case to the Social Security Administration pursuant to sentence four of § 405(g) due

to the problems discussed above. On remand, the ALJ should be directed to evaluate the

evidence of record, including the medical source opinions, under the applicable legal

criteria mandated by the Commissioner's Regulations and Rulings and by case law; and

to evaluate Plaintiff's disability claim under the required five-step sequential analysis to

determine anew whether Plaintiff was under a disability and whether her application for

Supplemental Security Income should be granted.

**IT IS THEREFORE ORDERED THAT**:

1.    The Commissioner's non-disability finding is vacated;

2.    No finding is made as to whether Plaintiff Mozette Chinn was under a "disability" within the meaning of the Social Security Act;

3.    This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4.    The case is terminated on the Court's docket.

Date:  March 19, 2020                    *s/Sharon L. Ovington*
                                         Sharon L. Ovington
                                         United States Magistrate Judge